## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TERRA JENNINGS, *et al.*,
     Plaintiffs,

vs.

ALLSTATE VEHICLE AND PROPERTY
INSURANCE CO., *et al.*,
     Defendants.

Case No. 1:20-cv-464

Litkovitz, M.J.

**ORDER**

This matter is before the Court on the motions of defendants Integon National Insurance Company ("Integon") (Docs. 98, 100)[1] and Allstate Vehicle and Property Insurance Company ("Allstate") (Docs. 114, 117)[2] for summary judgment on all counts. Plaintiff[3] opposed both motions (Docs. 104, 130), and defendants filed reply memoranda (Docs. 105, 136). Following a requested stay and partial settlement, these motions are now ripe for adjudication. For the reasons set forth below, defendants' motions for summary judgment will be granted on all claims.

### I.    Background

#### A.  Factual Background

The facts in this matter are largely undisputed. Plaintiff Terra Jennings owns real estate containing a single-family home in Hamersville, Ohio. From mid-2016 through mid-2018, she

---

[1] Integons' first filing (Doc. 98) did not comply with the Court's Local Rule regarding formatting so Integon refiled the same motion for summary judgment in the correct format (Doc. 100). For ease of citation, the Court will refer to docket entry 98.

[2] Allstate's first filing (Doc. 114) did not comply with the Court's Local Rule regarding formatting so Allstate refiled the same motion for summary judgment in the correct format (Doc. 117). For ease of citation, the Court will refer to docket entry 114.

[3] Although John Jennings was listed as a plaintiff in the complaint, Terra Jennings' affidavit indicates that she is the sole owner of the property at issue. (Doc. 104-2 at PAGEID 899). She purchased the property in approximately 2013, and, at all times relevant to this action, has remained the sole owner of the property. (Doc. 105-1 at PAGEID 992). John Jennings' claims have been dismissed for want of prosecution. (Doc. 140). Terra Jennings is the sole remaining plaintiff in this matter.

insured the home through an Integon[4] homeowner's policy.  Beginning in August 2018, she

insured the property through a policy issued by Allstate.

On July 27, 2018, a storm damaged the home.  Integon admits coverage for the July 27,

2018 storm damage.  Before that damage was repaired, high winds caused a tree to fall on the

home.  Allstate admits coverage for the May 3, 2019 wind and tree damage.  Before that damage

was repaired (and while neither policy covered the home), the property suffered criminal

vandalism and arson.  Plaintiff's stepson admitted responsibility for the vandalism and arson, and

he has been ordered to pay more than $50,000 in restitution.

Plaintiff alleges that both insurance companies breached their insurance contracts and

unreasonably delayed payment on her claims, causing her additional and ongoing damages.

Defendants contend that plaintiff's actions delayed payment under the policies, and both

insurance companies now move for summary judgment on all claims.

### 1.  Claims Under the Integon Policy

On July 27, 2018, high winds and heavy rain caused significant damage to plaintiff's

property.  Plaintiff promptly reported the property damage to Integon.  Integon set up two

separate claims to address the damage from the July 27, 2018 storm.  Claim number 3436339

addressed storm damage to the home's roof and air conditioning unit ("Claim 1"), and claim

number 3461034 addressed interior water damage to the home ("Claim 2").  (Tonelli Aff., Doc.

98-2 at PAGEID 819).

Integon hired Hausch & Company ("Hausch"), an independent adjusting company, to

assist with plaintiff's claims.  (*Id.*).  On August 20, 2018, Integon paid plaintiff $4,290 for

damage to the air conditioner.  (*Id.*).  On September 27, 2018, Hausch calculated the replacement

---

[4] Integon is part of National General Auto, Home & Health Insurance, and the parties use the names "Integon" and "National General" interchangeably.  (Doc. 105-1 at PAGEID 992).

cost of plaintiff's roof to be $7,220.10. (*Id.*). Integon applied the policy's $1,000 deductible and depreciation Hausch calculated to be $2,875.10 from the replacement cost of $7,220.10, resulting in a $3,345 payment to plaintiff on September 27, 2018 for plaintiff's roof. (*Id.*). On December 17, 2018, plaintiff indicated roof repairs had been completed and requested the depreciation payment. (*Id.* at PAGEID 819-20). Integon paid $2,875.10 for depreciation ten days after plaintiff's request. (*Id.*). Thus, as of December 27, 2018, Integon had paid plaintiff a total of $10,510.10 ($7,220.10 for roof damage plus $4,290 for air conditioner damage minus $1,000 deductible) on Claim 1.

Regarding Claim 2, Integon initially estimated damages totaling $1,622.12 to the inside of the home. (Doc. 98-2 at PAGEID 820). After again applying a $1,000 deductible, Integon paid plaintiff $622.12 on August 30, 2018. (*Id.*). After a "subsequent reinspection revealed more damage," Integon estimated the replacement cost to repair the interior water damage at $10,908.79 with depreciation of $2,860.63. (*Id.*). On November 5, 2018, Integon paid plaintiff $6,426.04 ($10,908.79 replacement value minus $1,000 deductible minus $2,860.63 depreciation minus $622.12 already paid) on Claim 2. (*Id.*).

Jennings objected to Integon treating the single incident as two separate claims and applying two separate $1,000 deductibles. (Jennings Aff., Doc. 104-2 at PAGEID 900). She claims that Integon "intentionally low-balled" her with a $1600 water damage estimate and attempted to "manipulate" her contractor into performing cosmetic fixes rather than returning the property to its prior condition, as required under her policy. (*Id.*).

The parties agree that Integon and Jennings had no communications with each other from December 2018 through June 2019. On May 3, 2019 (after Integon no longer insured the property), high winds caused a tree to fall on plaintiff's home. On June 26, 2019, Jennings filed

3

a written request for appraisal on her Integon claims.  (Doc. 104-2 at PAGEID 900).  According to Jennings, Integon was required to respond to her appraisal request within ten days, but they failed to do so.  (*Id.*).  She sent a second request for appraisal on July 29, 2019.  (*Id.*).  Integon alleges that Jennings verbally advised that she wanted appraisal on her claims in June 2019, but did not provide a written demand for appraisal until July 29, 2019.[5]  (Doc. 98-2 at PAGEID 821).

On July 31, 2019, Integon identified Paul Nash as its appraiser.  Jennings selected Don Cochlin as her appraiser.  (*Id.*).

On August 28, 2019, Nash and Cochlin met Jennings at the property.  (Nash Aff., Doc. 9-2 at PAGEID 260).  Nash and Cochlin agreed that Mike Abell would serve as umpire if they could not reach an agreed value for the Integon claims.  (*Id.*).

During the property inspection, Cochlin informed Nash that after the Integon claim, the May 2019 storm caused a tree to fall, additionally damaging the property.  (*Id.*).  Cochlin estimated plaintiff's total damages at $96,569.47.  (Doc. 19 at PAGEID 313).  Nash "prepared an estimate based upon [his] inspection and the original adjuster's loss photos since the Plaintiff's home had sustained additional storm damage" after Integon no longer insured the property.  (Doc. 9-2 at PAGEID 260).  The damage estimates of Nash and Cochlin "were very different" so they agreed to submit the Integon claims to umpire Mike Abell.  (*Id.* at PAGEID 260-61).

On February 26, 2020, Integon notified Jennings that it had referred her claims to the "Special Investigation Unit . . . for investigation and verification."  (Doc. 104-3 at PAGEID 915-

---

[5] Jennings' July 29, 2019 appraisal demand email specifically references a "typed demand for appraisal sent over to you a couple of weeks ago."  (Doc. 98-2 at PAGEID 822; Appraisal Demand dated June 20, 2019, Doc. 104-3 at PAGEID 922-23).

16). As part of this "Special Investigation," Integon requested recorded interviews with both Jennings and her husband. (*Id.*).

On May 4, 2020, Jennings, represented by attorney Gary Lewis, filed this action in the Court of Common Pleas for Brown County, Ohio. Defendants then removed the action to this Court.

After Jennings' failed attempts to withdraw her appraisal demand, Abell, Nash, and Cochlin met at the property for an umpire's appraisal. (Doc. 105-1 at PAGEID 1008). For the umpire's decision to take effect, two of the three appraisers must agree to it. (*Id.*). At that time, neither Nash nor Cochlin agreed with Abell's appraisal, and both refused to sign it. (*Id.*).

Ultimately, Nash (Integon's appraiser) agreed to sign the umpire's appraisal (Doc. 105-1 at PAGEID 1008), but Cochlin (Jennings' appraiser) refused to do so because he believed the umpires' appraisal "was way, way under the amount that it was going to . . . cost" to properly repair the roof and water damage and because he had concerns about the unusually long time period between the umpire's appraisal and Nash's willingness to sign off on it. (*Id.* at PAGEID 1006, 1008).

The umpire valued Jennings' loss under the Integon policy at $12,684.72 on Claim 1 (roof and air conditioner) and $23,933.75 on Claim 2 (water damage). (Doc. 77-1 at PAGEID 709-10). The umpire's appraisal was finalized on August 16 and 17, 2021. (*Id.*).

On September 2, 2021, Integon's attorney emailed plaintiff's attorney, Gary Lewis, his mathematical calculations of the umpire's valuation minus one deductible for each claim and amounts Integon previously paid to Jennings. According to those calculation, Integon owed Jennings $5,454.62 on the roof claim and $14,685.59 on the water damage claim. (Doc. 98-1 at

PAGEID 803).  Unfortunately, by this time, Lewis was gravely ill (Doc. 104-2 at PAGEID 902), and he died in December 2021.  (Doc. 98-1 at PAGEID 801).

Plaintiff ultimately retained new counsel, F. Harrison Green, to represent her in this action and to file an action in state court against her former attorney Gary Lewis.  On February 27, 2023, Integon's counsel sent plaintiff's new counsel a check for the unpaid appraisal amounts as outlined in Integon's September 2, 2021 email to Gary Lewis.  Although neither Jennings nor Integon cite to record evidence, it appears undisputed that Jennings has not yet received the funds Integon dispersed on February 27, 2023 because Integon made the check payable to Jennings and the Estate of Gary Lewis.  (Doc. 104 at PAGEID 879-80 and Doc. 105 at PAGEID 985).  Jennings and Lewis's estate have been unable to agree on the allocation of the funds dispersed.

## 2.  Claim Under the Allstate Policy

Effective August 17, 2018, plaintiff insured her home through Allstate.  (Doc. 130-3 at PAGEID 1497).  On May 3, 2019, high winds caused a tree to fall on Jennings' home.  (Doc. 130-4 at PAGEID 1548).  Jennings promptly reported the damage to Allstate.

Within four days of the May 3, 2019 tree damage, Allstate adjuster Bob Roth informed plaintiff that her home's initial "board up" had been completed, a structural engineer would be evaluating the home's foundation, and contractor Hays and Sons would be in contact to set up an inspection and repair estimate.  (Pleasant Aff., Doc. 114-3 at PAGEID 1153-54).[6]  Allstate adjuster Alison Davis sent Jennings a letter on May 7, 2019, explaining "Your Additional Living Expenses," how to track and submit them to Allstate, "Your Next Steps," and contact information for both Roth and Davis.  (*Id.* at PAGEID 1168-70).

---

[6] Paul Pleasant is a senior investigator in Allstate's Special Investigations Unit.  (Doc. 114-3 at PAGEID 1153). Plaintiff does not dispute the statements contained in Pleasant's Affidavit.  (*See* Doc. 130).

On May 13, 2019, Donan Engineering inspected the home, at Allstate's request, but required additional approval to remove part of the ceiling for proper evaluation. (*Id.* at PAGEID 1154-55). Two days later, Jennings informed Roth that she preferred to have her own electrician and public adjuster ("PA") inspect her home instead, and Roth asked Jennings to have her PA call him. (*Id.* at PAGEID 1155). Davis telephoned Jennings on May 23, 2019, but Jennings advised that her family was on vacation until May 31, 2019. (*Id.* at PAGEID 1156). On June 4, 2019, Jennings informed Roth that her PA was on vacation, and Roth advised Jennings that "things need to get moving to prevent further damage" since it had been a month since the tree fell. (*Id.* at PAGEID 1156-57).

On June 6, 2019, Jennings requested additional living expenses, and Davis said she would make the arrangements. (*Id.* at PAGEID 1157). On June 10, 2019, Roth and Jennings spoke on the telephone. Roth indicated he had not heard from Jennings' PA, and Jennings confirmed that the contents of her home were not damaged, but they would need to be moved to complete the necessary repairs. (*Id.*). Jennings further indicated that, among other issues, the tarp on her home had become loose. (*Id.*). Roth responded that Allstate could re-tarp the roof but needed to inspect the home to evaluate the full extent of damage and that additional damages caused by delays might not be covered. (*Id.*). Roth left Jennings a message on June 17, 2019 indicating that he still had not received anything from her PA. (*Id.* at PAGEID 1157-58).

Also on June 17, 2019, Davis mailed Jennings a letter explaining that Jennings must submit a completed proof of loss form "withing sixty (60) days from the date of the loss or thirty (30) days from the date of this letter, whichever is later. Otherwise, your claim cannot receive further consideration." (Doc. 114-3 at PAGEID 1171). The letter included a blank sworn proof of loss form, explained the specific information required for completing the form (including a

detailed list of damaged property "showing the quantity, cost, actual cash value, and the amount

of loss claimed," and producing "receipts for any increased costs to maintain your standard of

living while you reside elsewhere,"), and quoted the policy language for the section entitled,

"WHAT YOU MUST DO AFTER A LOSS."  (*Id.* at PAGEID 1171-73).  In addition, Davis

mailed Jennings a reservation of rights letter that reiterated that Allstate was "reserving our right

to later deny coverage obligation and assert a defense of no coverage under the policy" and

quoted the policy language for section 3(a) through (f) entitled "What You Must Do After A

Loss." [7]  (*Id.* at PAGEID 1174-75).

---

[7] The section Davis quoted here provides:
  3.  What You Must Do After A Loss
  In the event of a loss to any property that may be covered by this policy, you must:
  a)  promptly give us or our agent notice.  Report any loss involving theft, vandalism or burglary to the police as soon as possible.
  b)  protect the property from further loss.  Make any reasonable repairs necessary to protect it.  Keep an accurate record of any repair expenses.
  c)  separate damaged from undamaged personal property.  Give us a detailed list of the damaged, destroyed or stolen property, showing the quantity, cost, actual cash value and the amount of loss claimed.
  d)  give us all accounting records, bills, invoices and other vouchers, or certified copies, which we may reasonably request to examine and permit us to make copies.
  e)  produce records supporting any claim for loss of fair rental income as often as we reasonably require.
  f)  as often as we reasonably require:
    1)  show us the damaged property.
    2)  at our request, submit to examinations under oath, separately and apart from any other person defined as you or insured person, and sign a transcript of the same.
    3)  produce representatives, employees, members of the insured's household or others to the extent it is within the insured person's power to do so; and
    4)  cooperate with us in the investigation or settlement of the claim, including providing available information concerning tenants; and
  g)  within 60 days after the loss, give us a signed, sworn proof of the loss.  This statement must include the following information:
    1)  the date, time, location and cause of the loss;
    2)  the interest insured persons and others have in the property, including any encumbrances;
    3)  the actual cash value and amount of loss for each item damaged, destroyed or stolen;
    4)  any other insurance that may cover the loss;
    5)  any changes in title, use, occupancy or possession of the property that have occurred during the policy period;
    6)  at our request, the specifications of any damaged building structure or other structure.
  We have no duty to provide coverage under this section if you, an insured person, or a representative of either fail to comply with items a) through g) above, and this failure to comply is prejudicial to us and we will avail ourselves of any other policy defenses, which may arise.
(Doc. 114-3 at PAGEID 1174-75).  This policy language is slightly different than the language quoted in her explanatory letter.  (*See* Doc. 114-3 at PAGEID 1172).

On June 18, 2019, Jennings advised Roth that Don Cochlin would serve as her PA, and Cochlin would contact Roth. (Doc. 114-3 at PAGEID 1158). Roth responded that Allstate needed to inspect and evaluate the damage before an appraisal, and he would "follow-up once the PA contacts him." (*Id.*). On June 24, 2019, Roth called Jennings and left a message indicating he had not heard from Cochlin and that her claim was on hold until Cochlin contacted him. (*Id.* at PAGEID 1158-59). Roth again noted that "additional damages may not be covered due to the delays." (*Id.* at PAGEID 1159). The next day, Jennings told Roth that Cochlin had assessed the damages and would send the information to Allstate, but Cochlin was acting only as her appraiser rather than a PA so Roth should continue to work directly with her on the claim. (*Id.*). Having learned that the Donan engineer Roth previously engaged was no longer with the company, Roth contacted Rimkus Engineering to schedule an inspection for the following Tuesday. (*Id.*).

On July 3, 2019, the Rimkus engineer advised Roth that he had met with Jennings at the property, and he would prepare his report for Allstate. (*Id.*). Two days later, Roth arranged for a rented mobile home to be placed on the property. Roth also informed Jennings that he could not arrange a repair estimate until he received the engineer's report. (*Id.* at PAGEID 1160).

On July 25, 2019, Roth received the engineer's report, assigned Belfor Property Restoration to perform Allstate's repair estimate, and informed Jennings that he had done so. (*Id.*). Jennings emailed Roth a statement of work her husband had completed for temporary repairs. (*Id.*).

Belfor scheduled the inspection for August 5, 2019, but, due to a death in the family, Jennings asked to reschedule. (*Id.* at PAGEID 1161). On August 12, 2019, Roth received an email from "Don" asking if Allstate had assigned an appraiser. (*Id.*). Roth advised that Jennings

had not invoked "appraisal."  (*Id.*).  Two days later, Roth left a message for Jennings regarding

scheduling the Belfor inspection.  (*Id.*).  That same day, Roth "received a copy of an appraisal

contract" between Jennings and Cochlin, but he emailed Cochlin and Jennings "regarding the

fact that no request for an appraisal had been made and attaching the portion of the policy

regarding appraisal."  (Doc. 114-3 at PAGEID 1161).

Also on August 14, 2019, Davis sent Jennings a letter reminding her that Allstate "has

not received the completed, signed, and notarized Proof of Loss form that was mailed to you on

June 17, 2019."  (Doc. 114-3 at PAGEID 1176).  The letter attached a second, blank proof of

loss form, requested that Jennings return the completed, notarized form "along with any bills,

receipts, and inventories pertinent to this loss."  (*Id.*).  The letter further stated that "I must advise

you that I cannot complete the investigation of the loss without these documents."  (*Id.*).

On August 19, 2019, Roth again emailed Jennings because she still had not scheduled the

Belfor inspection.  (*Id.* at PAGEID 1162).  On September 16, 2019, a Belfor representative

advised Roth that Jennings had called Belfor to say that she had been ill but was now ready to

schedule the inspection.  (*Id.*).

On September 19, 2019, Davis sent Jennings a letter stating, in part:

> I have not received your Sworn Statement in Proof of Loss form and arrangements
> have not been made for Matt at Belfor to inspect the damages.  Please be advised
> that Allstate Insurance Company can give no further consideration to your claim
> without the completed Sworn Statement in Proof of Loss form and inspection of
> the damages.  If an appointment is not scheduled with Matt at Belfor by 10/1/2019
> we will discontinue all activity on the claim and make arrangements to have the
> mobile home picked up.

(Doc. 114-3 at PAGEID 1177).

Belfor completed the inspection on October 1, 2019, and began preparing its estimate.

(Doc. 114-3 at PAGEID 1163).  Belfor estimated the cost to repair Jennings' home at

$71,446.84. (Doc. 130-4 at PAGEID 1559). Belfor's estimate was marked "valid for 30 days from 10/29/2019." (*Id.*).

On October 9, 2019, Jennings submitted a notarized proof of loss form. (Doc. 114-3 at PAGEID 1163). On the form, Jennings completed the section regarding the date and cause of the damage, and the title in her residence. (Doc. 130-4 at PAGEID 1548). She also noted her policy limit on the Allstate policy of $202,000. (*Id.*). However, in the spaces asking the actual cash value of the home, the loss and damage, and the amount claimed under the policy, Jennings wrote "unknown." (*Id.*). Under "SCHEDULE 'B' – STATEMENT OF ACTUAL CASH VALUE AND LOSS AND DAMAGE," Jennings wrote "Unknown at this time; still evaluating losses to personal property." (Doc. 130-4 at PAGEID 1549). Plaintiff attached to the proof of loss form[8] a multipage, hand-written document that lists categories and dollar amounts for each category totaling $182,221.05, including: "Furniture" ($37,229); "Lost wages/Time off work ($16,400); "1st Moving Expenses" ($10,244.89); "Storage Fees" ($4,000); "2nd Moving Fees/Expenses" ($3,673.52); "3rd Moving Fees/Expenses" ($4,581.36); "Labor/Materials/Expenses" ($13,045.44); and "Increase in utility bills for 2 homes" ($21,600). (Doc. 130-1 at PAGEID 1468; 130-4 at PAGEID 1557). Many of the categories are further broken down into smaller, hand-written components, such as listing specific furniture pieces or dividing "Unfreezing of Water Pipes/Trailer/Septic" into labor ($10,500) and materials ($600). (Doc. 130-4 at PAGEID 1550-57).[9]

The following day, Davis sent Jennings a letter rejecting the proof of loss form because:

---

[8] Allstate's attorney swears that Jennings' handwritten list was not attached to her proof of loss form nor submitted to Allstate until Court-ordered discovery was received on November 6, 2023. (Trenz Aff., Doc. 136-1 at PAGEID 1653).

[9] Plaintiff further testified that while those figures were accurate at the time, she continues to suffer ongoing losses. (Doc. 130-2 at PAGEID 1468). She more recently estimated her total losses (including attorneys' fees) to be $1,459,487.91. (Doc. 114-2 at PAGEID 1135-39).

We do not agree with the amount being claimed of "unknown".

No analysis or breakdown of the figure is given; nor is there any detailed statement of loss other than this lump sum given; nor is there any data contained in the said instrument from which those matters can be determined.

(Doc. 114-3 at PAGEID 1180). Davis attached yet another blank Proof of Loss form. (*Id.*).

On October 21, 2019, Jennings emailed Roth a request for the Belfor estimate, indicating that "Matt said it was submitted to you a while ago." (Doc. 130-2 at PAGEID 1486). Early the next morning, Roth responded that he had received Belfor's "initial estimate draft and it is still under review/revision," but he would send a copy once it was approved. (Doc. 130-2 at PAGEID 1486, Doc. 114-3 at PAGEID 1163 ("revisions were requested")). Roth also asked Jennings for a copy of her contractor's estimate. (Doc. 130-2 at PAGEID 1486).

Also on October 22, 2019, Jennings requested payment for her moving expenses and the work she and her husband did in performing tarping and temporary repairs to the home. (Doc. 130-2 at PAGEID 1487). Her email to Roth stated, in part:

I never received any payment on this. Not even an undisputed amount. For work we have completed, some demo and tarping we should be paid at contractor pay. We are a licensed business/general contractor. Please forward prompt payment for, at minimum, the undisputed amount. Please line itemize what we are being paid for and reimbursed for so that we may further pursue the disputed amount in the future. We have spent thousands out of pocket without being reimbursed for anything since July. That is over 3 months we have been patiently [a]waiting our reimbursement. I have coverages specifically to cover these out of pocket expenses, so as not to place an unnecessary hardship on our family.

(Doc. 130-2 at PAGEID 1487). Roth responded within hours that "there is no undisputed amount owed on your claim." (*Id.*). He elaborated that, as he discussed in an attached August email, Jennings had not settled the issues regarding the "price factors" that "aren't applicable to work done by an individual" nor had she provided photographs of the 120 boxes she and her family had packed or timesheets for the 147 hours of work she claimed was performed. (*Id.* at

PAGEID 1487-88).  Roth also requested "paid receipts" for claimed expenses and noted that Allstate was "awaiting completion of the Proof of Loss form that was rejected as it was incomplete."  (*Id.* at PAGEID 1487).  Jennings replied approximately an hour later that:  (1) Roth told her and her husband to cut out the ceilings to assist Allstate's engineer in evaluating the damage; (2) "You don't send paid receipts for work completed, when you're the company that completed the work.  You send an invoice.  Which is what you received."; and (3) Without assistance, explanation, or "numbers from your company or a full assessment of costs and damages to personal property," she is unable to complete the proof of loss form provided.  (Doc. 130-2 at PAGEID 1489).

The next day Roth emailed Jennings that he would be "happy to reimburse you for expenses you've incurred," once she provides "receipts or verification for those expenses" as explained in his August email.  (*Id.* at PAGEID 1491).  Jennings immediately requested the name and telephone number for Roth's supervisor.  (*Id.*).

On October 24, 2019, Jennings explained the difference in hourly rates that she and her husband charged are "due to emergency services."  (Doc. 130-2 at PAGEID 1491-92).  She further noted that the engineers Allstate hired had verified and taken pictures of the damaged areas as well as "the cut out ceilings and removal of insulation and containment" that Jennings and her husband had completed.  (*Id.* at PAGEID 1492).  In addition, Jennings and her family packed and removed their possessions "long before you stipulated the storage had to be onsite." (*Id.*).  She agreed to forward to Roth "additional rent receipts" and expenses related to moving her minor son "whose room was the most affected by the tree and moisture/mold."  (*Id.*).

That same day, Roth agreed to pay Jennings $1492.29 "for lines 1-4" of the document she submitted as well $34.62 per hour for two people for 12 hours each (for a total of $830.88)

for packing and item removal.  (*Id.*).  According to Roth, any additional payments for work performed by Jennings and her family or related moving or living expenses would require the requested verification.  (*Id.*).  Roth also provided his supervisor's name and telephone number. (*Id.*).

In November 2019, Jennings filed a complaint with the Ohio Department of Insurance. Jennings' affidavit indicates the complaint was filed on November 18, 2019.  (Doc. 130-1 at PAGEID 1468; Doc. 130-3 at PAGEID 1494).  However, the email correspondence Jennings submitted implies it was actually filed earlier.  On November 6, 2019, Roth emailed Jennings a copy of the approved Belfor estimate.  (Doc. 130-2 at PAGEID 1472).  Roth's email states, in part, that "[t]he first 9 lines are for work needed as a result of delays and the lack of timely mitigation and will need to be discussed further.  The estimate has also been sent to the Dept[.] of Insurance as part of our response to your complaint."  (*Id.*).

Also on November 6, 2019, Allstate assigned Special Investigations Unit ("SIU") Senior Consultant Dawn Syler to investigate plaintiff's claim.  (Syler Aff., Doc. 136-2 at PAGEID 1654).[10]  During a telephone conversation that day, Syler requested a recorded statement from Jennings, and Jennings advised that she had retained "an attorney for bad faith" and expressed her belief that the assignment of her claim to the SIU was "in retaliation for putting in a Department of Insurance Complaint."  (*Id.*).  Syler requested a representation letter from Jennings' attorney and advised Jennings that "the reason for the SIU investigation is due to the handwritten receipts that [Jennings] presented that need to be verified, the storage costs and the contents being claimed among other items."  (*Id.*).  They scheduled Jennings' recorded statement for November 8, 2019 at noon.  (*Id.*).

---

[10] Jennings does not dispute Syler's affidavit or offer evidence contrary to that contained in Syler's affidavit.

Syler was unable to reach Jennings on November 8, 2019. (Doc. 136-2 at PAGEID 1655). Syler emailed Jennings on November 12, 2019 to reschedule the recorded statement, and Jennings responded on November 18, 2019 that she would accept Belfor's estimate for the dwelling coverage and requested payment. (*Id.*). Syler "responded that the investigation still needs to be completed and noted to [Jennings] that the estimate includes items that might not be covered." (*Id.*).

On November 14, 2019, Jennings advised Roth that the Belfor estimate is "fair; with the understanding that there may be additional supplements added as they dig deeper and may find more damage once the job gets started." (Doc. 130-2 at PAGEID 1473). Jennings also indicated that her personal property suffered "moisture damage and growth on some of [her] larger furniture, that was expected to remain in the house during this process. I will be going through and will provide a list as soon as possible and forward that to [Roth]." (*Id.*). Jennings then asked when payment for the damage to the structure would begin. (*Id.*). On Monday, November 18, 2019, Roth reiterated that no additional payments would be made until Allstate's investigation was complete. (*Id.*).

Jennings responded that, according to her understanding, only the additional living expenses were under investigation and the undisputed structural damage portion of the claim should be paid immediately in accordance with the Belfor estimate. (Doc. 130-2 at PAGEID 1473-74). Indeed, she suggested that Allstate could "continue to dispute and investigate the 'additional living expenses' reimbursement but that should NOT be a valid reason to hold up payments to begin repairs to the home." (*Id.* at PAGEID 1474). She also requested that Roth or Syler "provide highlighted portions of [her] policy that states that Allstate has the right to deny

payments on one section of coverage of my policy, due to dispute and investigation on another section of my policy." (*Id.*)

Syler, on November 21, 2019, emailed Jennings "the section from your policy that would apply to your request. Section 1 Conditions, paragraph 3, What You Must Do After a Loss, subparagraph A thru G and the paragraph below it. This refers to the loss, encompassing all coverages related to that loss." (*Id.* at PAGEID 1474). The section to which Syler referred provides:

**What You Must Do After A Loss**
In the event of a loss to any property that may be covered by this policy, **you** must:
a) immediately give **us** or **our** agent notice. Report any theft to the police as soon as possible.
b) protect the property from further loss. Make any reasonable repairs necessary to protect it. Keep an accurate record of any repair expenses.
c) separate damaged from undamaged personal property. Give **us** a detailed list of the damaged, destroyed or stolen property, showing the quantity, cost, actual cash value and the amount of loss claimed.
d) give **us** all accounting records, bills, invoices and other vouchers, or certified copies, which **we** may reasonably request to examine and permit **us** to make copies.
e) produce receipts for any increased costs to maintain **your** standard of living while **you** reside elsewhere, and records supporting any claim for loss of rental income.
f) as often as **we** reasonably require:
   1) show **us** the damaged property. **We** have a right to reasonable and safe opportunities to view and inspect the loss as often as necessary, unimpeded by actions of **you** or others, including, but not limited to, civil, governmental or military authorities, that prevent **us** from viewing and inspecting the loss. **We** may require **you** to accompany **us** when **we** conduct these activities.
   2) at **our** request, submit to examinations under oath, separately and apart from any other person defined as **you** or **insured person** and sign a transcript of the same.
   3) produce representatives, employees, members of the **insured person's** household or others to the extent it is within the **insured person's** power to do so; and
g) within 60 days after the loss, give **us** a signed, sworn proof of the loss. This statement must include the following information:
   1) the date, time, location and cause of loss;

    2) the interest **insured persons** and others have in the property, including any encumbrances;

    3) the actual cash value and amount of loss for each item damaged, destroyed or stolen;

    4) any other insurance that may cover the loss;

    5) any changes in title, use, occupancy or possession of the property that have occurred during the policy period; and

    6) at **our** request, the specifications of any damaged **building structure** or other structure.

**We** have no duty to provide coverage under this section if **you**, an **insured person**, or a representative of either fail to comply with items a) through g) above, and this failure to comply is prejudicial to **us**.

(Doc. 130-2 at PAGEID 1475). In addition to highlighting this policy language, Syler emailed Jennings that: she was "still awaiting a completed Sworn Statement in Proof of Loss and a complete list of all the damaged items"; and she had received copies of handwritten receipts for storage charges but needed to know who provided the receipt, whose name appears at the bottom of the handwritten receipts, and the address at which the items were being stored. (*Id.* at PAGEID 1474).

The next day, Jennings emailed Syler and Roth that she reviewed the policy language Syler sent, but "[i]t is still unclear to me where my policy states I am required to provide you anything other than receipts, for the reimbursement I am entitled to." (Doc. 130-2 at PAGEID 1476). Jennings further stated that "I do not see where it is outlined that Allstate is able to withhold payment for damages, under my structural policy coverages, because of a dispute under the additional living expenses portion of my policy, especially when I have provided the receipts required by my policy." (*Id.*). Jennings also discussed at length the hardships her family continued to suffer because the home was uninhabitable, including increased moisture damage to furniture and appliances, requiring a family of four to live in an 800 square foot mobile home with little storage, living away from their youngest son so he could be protected from "microorganism growth," and losing wages due to lost work time to accommodate engineer and

contractor visits to the property. (*Id.*). Jennings concluded her lengthy email by noting that "[h]olding up over $70000 of undisputed structure damage claim money over $3000 worth of additional living expense reimbursement seems unethical at best, if not illegal." (*Id.* at PAGEID 1477).

Jennings and Syler continued to email each other, but Jennings failed to provide the information Syler sought. (Doc. 136-2 at PAGEID 1655-56). On December 3, 2019, Syler asked Allstate's staff counsel to arrange an examination under oath ("EUO"). (*Id.* at PAGEID 1656). Syler continued to try to contact Jennings, and on January 6, 2020, Syler received a letter of representation from attorney Gary Lewis. (*Id.*). Syler then contacted Allstate's staff attorney regarding his efforts to schedule an EUO with Jennings' attorney at least monthly through March 2020. (*Id.*).

On April 3, 2020, Syler was advised that Jennings and her attorney asked to delay the EUO due to the restrictions imposed in response to the Covid-19 pandemic. (*Id.*). On April 9, 2020, Syler learned that a storm the previous night caused lightning to strike the rented mobile home Allstate had placed on Jennings' property in 2019. (*Id.*). Syler contacted Lewis and Jennings to discuss the storm damage to the trailer. (*Id.* at PAGEID 1657). On May 1, 2020, Syler was advised that Jennings would be filing this action. (*Id.*).

Jennings' EUO occurred on November 23, 2020. "Since Allstate did not know what damages were attributed to the claim with Integon, Allstate needed to compare the Integon damages claim so as not to pay for overlapping items." (Doc. 136-2 at PAGEID 1657). Therefore, Syler advised Allstate's counsel that duplications needed to be confirmed or eliminated before paying Jennings' claim. (*Id.*).

On September 30, 2021, Allstate paid Jennings $71,446.46 for the May 2019 tree damage, in exchange for a "Partial Release and Indemnity Agreement." (Doc. 105-1 at PAGEID 1020; Doc. 114-2 at PAGEID 1130-31). Although Jennings' home had been boarded up and trail cameras installed to secure the property, Jennings testified at her deposition that "no contractor will touch that house" for the amount that she has received. (Doc. 105-1 at PAGEID 1019-1020). Jennings' house has been "sitting empty" for several years. (*Id.* at PAGEID 1022) On September 10, 2021—just weeks before she signed the partial release of claims with Allstate—a contractor plaintiff hired recommended that, due to structural damage caused when the tree fell on the house, the house needed to be torn down and rebuilt at an estimated cost of $329,272. (Doc. 105-1 at PAGEID 1024-25).

### 3. Arson and Vandalism

On approximately May 6, 2023, the son of Jennings' estranged husband set fire to an automobile, a 29-foot travel trailer, a horse barn and some other outbuildings on Jennings' property. (Doc. 130-3 at PAGEID 1542-43; Doc. 105-1 at PAGEID 1015). Although the residence on the property suffered no fire damage, it was vandalized. (Doc. 105-1 at PAGEID 1015). The property was not insured at the time of the arson and vandalism. (*Id.* at PAGEID 1019). Dylan Jennings pled guilty to two counts of arson, and he was ordered to pay Terra Jennings $56,500 in restitution. (Doc. 130-3 at PAGEID 1546-47). She has not received any payments toward the restitution and does not expect to receive restitution from him in the future. (Doc. 105-1 at PAGEID 1019).

### B. Relevant Procedural History

Plaintiff, represented by attorney Gary Lewis, filed this action in the Court of Common Pleas for Brown County, Ohio. (Doc. 3). On June 11, 2020, Integon, with Allstate's consent,

removed the matter to this Court based on diversity of citizenship, pursuant to 28 U.S.C. § 1332. (Doc. 1). All parties consented to jurisdiction pursuant to 28 U.S.C. § 636(c), so this matter was referred to the undersigned United States Magistrate Judge for disposition. (Doc. 14).

On February 8, 2021, the Court granted Integon's motion to stay these proceedings and compel appraisal as required by the terms of the insurance policy between Integon and Jennings. (Doc. 36). On August 16 and 17, 2021, the umpire valued Jennings' loss for the July 27, 2018 damage covered by the Integon policy at $12,684.72 on her roof claim and $23,933.75 on her water damage claim. (Doc. 77-1 at PAGEID 709-10). Jennings objected to the umpire's valuations, and the dispute with Integon remained unresolved when Jennings' attorney, Gary Lewis, died in December 2021. (Doc. 98-1 at PAGEID 801).

On September 30, 2021, Jennings signed a "Partial Release and Indemnity Agreement" with Allstate. (Doc. 130-2 at PAGEID 1469-70). In that agreement, Jennings acknowledged receipt of Allstate's payment for $71,446.46[11] and released "all claims" they "now have or may hereafter have pursuant to Allstate policy number 992922434, ("the Policy") arising out of the property damage, expenses, and any loss or damage resulting from the occurrence of May 3, 2019 as specifically described . . . ." (*Id.* at PAGEID 1469). The agreement elaborates:

> Specifically, the occurrence which is the subject of this Partial Release and Settlement Agreement is the damage to the Jennings' residence at 2409 Eden Rd., Hamersville, OH 45130 as more fully described in the Belfor Property Restoration report and the included Belfor estimate dated October 29, 2019, in the amount of $71,446.84. Allstate and Jennings further agree that this partial release is intended to apply only to the occurrence detailed in the Belfor Estimate as described herein. This is a partial release and shall have no effect on the remaining claims and causes of action as stated in the pending action, Jennings, et al. v. Allstate Vehicle and Property Insurance, et al., Case Number 1-20-CV-464, as referenced above.

---

[11] The partial release and indemnity agreement between Jennings and Allstate sometimes lists the settlement amount as "$71,446.46" and sometimes (even on the same page) as "$71,446.84." (Doc. 130-2 at PAGEID 1469). The 38-cent difference in the partial settlement amount does not impact the Court's decision.

> As a further consideration for the payment of said sum, the undersigned further agree to indemnify, protect and hold forever harmless Allstate against loss from any and all further claims, demands or actions in law or equity and against all expenses, legal, or otherwise, resulting directly from the occurrence and resulting property damage of May 03, 2019 in the amount of $71,446.84 which may hereafter at any time be made or brought on behalf or instead of the undersigned, including but not limited to claims for indemnity, contribution or subrogation on the undersigned's behalf for the purpose of enforcing any other claim for damages on account of the occurrence on May 3, 2019.  The undersigned further agrees to dismiss with prejudice, all claims under the Policy directly related to the occurrence as defined herein of May 3, 2019, resulting in property damage in the amount of $71,446.84.

(*Id.* at PAGEID 1469-70).  Four days later, the attorneys representing Allstate and Jennings jointly filed a notice of partial dismissal with prejudice, which stated:

> Notice is hereby given that pursuant to Rule 41(a)(1)(A)(ii), all matters in controversy at issue with Plaintiffs and Defendant, Allstate Vehicle and Property Insurance Company, for property damage pertaining to Plaintiffs' breach of contract claims are hereby dismissed with prejudice for all purposes.  The remaining claims of the Plaintiffs against Allstate Vehicle and Property Insurance Company are not dismissed hereby.

(Doc. 46 at PAGEID 532).

After Lewis died, Jennings discharged Lewis's firm from representing her.  (Doc. 54 at PAGEID 550).  The Court granted the firm's motions to withdraw on March 28, 2022.  (Doc. 63).

On June 28, 2022, F. Harrison Green entered an appearance of counsel for Jennings. (Doc. 70).  Plaintiff then filed an Amended Complaint on August 18, 2022, alleging two bad faith claims and a breach of contract claim against Integon and two bad faith claims and a breach of contract claim against Allstate.  (Doc. 74).

On  November 4, 2022, Integon moved to enforce the August 17, 2021 appraisal awards. (Doc. 77).  Over plaintiff's one-sentence objection that cited no legal or evidential authority (Doc. 78), the Court granted Integon's motion to enforce the appraisal and ordered plaintiff to

provide Integon's counsel with certain information, including whether the mathematical calculations Integon provided were correct, whether a bank needed to be included on the payment, and whether Jennings had reached an agreement with Gary Lewis's estate as to the dispersal of the appraisal amount. (Doc. 80 at PAGEID 760).

On February 22, 2023, the Court conducted a status conference which resulted in an order staying this case pending mediation. (Doc. 84). Citing difficulties communicating with Jennings, plaintiff's counsel moved to withdraw from representation. (Doc. 87).

At the request of the parties, the Court canceled the mediation subject to rescheduling after resolution of various discovery disputes. (Doc. 89). On September 5, 2023, the Court lifted the stay, resolved the remaining discovery disputes, and established an amended calendar Order. (Doc. 92). As it appeared at that time that communication difficulties had been resolved, the Court denied Green's motion to withdraw as attorney for Jennings. (Doc. 93).

On March 8, 2024, Integon moved for summary judgment on all claims. (Docs. 98, 100). During the pendency of Integon's motion, plaintiff moved for a settlement conference. (Doc. 107). Following a status conference with the parties, the Court granted plaintiff's motion for a settlement conference (Doc. 111), and this matter was scheduled for mediation on August 13, 2024. (Doc. 113).

Prior to mediation, Allstate moved for summary judgment on all claims. (Docs. 114, 117). Plaintiff filed a motion to stay pending mediation (Doc. 118), which the Court granted (Doc. 119).

After mediation resulted in impasse, plaintiff's counsel renewed his motion to withdraw as attorney for Jennings. (Doc. 121). The Court granted Green's renewed motion to withdraw and granted Jennings an extension of time within which to secure new counsel or proceed pro se.

22

(Docs. 124, 125). Terra Jennings elected to proceed pro se. John Jennings failed to appear, apprise the Court of a change in address, or otherwise contact the Court in any way. After the Court's show cause Order was returned as undeliverable, John Jennings' claims were dismissed for want of prosecution. (Doc. 140). As to Terra Jennings' claims, defendants' motions for summary judgment are now ripe for consideration.

## II.     Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Id.*; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  However, "[f]acts that are not blatantly contradicted by [the evidence] remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011).  "In response to a properly supported summary judgment motion, the non-moving party 'is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Maston v. Montgomery Cty. Jail Med. Staff Pers.*, 832 F. Supp. 2d 846, 849 (S.D. Ohio 2011) (quoting *Sixty Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).

A fact is "material" if its resolution will affect the outcome of the lawsuit.  *Beans v. City of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *5 (N.D. Ohio Dec. 30, 2016), *aff'd,* No. 17-3088, 2017 WL 3726755 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 248).  The party who seeks summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.  To make its determination, the court "need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).

Because plaintiff is a pro se litigant, her filings are liberally construed.  *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005); *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) (pro se plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings). However, a party's status as a pro se litigant does not alter the party's duty on a summary judgment motion to support her factual assertions with admissible evidence.  *Maston*, 832 F. Supp. 2d at 851-52 (citing *Viergutz v. Lucent Techs., Inc*., 375 F. App'x 482, 485 (6th Cir. 2010)).

### III.    Integon's Procedural Issues

As an initial matter, Integon raises two procedural issues.  First, because plaintiff failed to attach the insurance policy to the amended complaint, Integon contends "there is no evidence put forth before the [C]ourt by [p]laintiffs as to the contract they contend was breached."  (Doc. 98 at PAGEID 795).  However, plaintiff attached a portion of the policy to the complaint filed in Brown County, Ohio (Doc. 3-1) prior to Integon's removal, and Integon attached the complete policy to its answer so the policy has been before the Court since at least June 22, 2020.  (Doc. 4-1).  Furthermore, neither party disputes the validity of the policy nor that the policy covered Jennings' 2018 property damage.

Second, Integon contends that "[p]laintiffs' opposition to Integon's motion [for summary judgment] is untimely and should not be considered."  (Doc. 105 at PAGEID 983).  Integon initially filed its motion for summary judgment on March 8, 2024.  (Doc. 98).  However, because the motion failed to comply with S.D. Ohio Civ. R. 5.1(c), Integon properly filed its motion on March 12, 2024.  (Doc. 100).  A memorandum in opposition is due "within twenty-one days after the date of service of the motion."  S.D. Ohio Civ. R. 7.2(a)(2).  Therefore, plaintiff's response was due on April 2, 2024.  Plaintiff's response was not filed until April 15, 2024.  (Doc. 104).

However, Integon failed to cite a single rule, case, or other authority in support of its extremely brief argument. (Doc. 105 at PAGEID 983). Courts have "consistently held that arguments . . . adverted to in only a perfunctory manner, are waived." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). *See also McCafferty v. Comm'r of Soc. Sec.*, No. 22-3865, 2023 WL 3737511, at *1 (6th Cir. May 31, 2023) ("We do not address arguments raised in a perfunctory manner or unsupported by record citation.") (citing *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022)); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Therefore, by failing to develop its argument or include citation to authority, Integon has waived its request to strike plaintiff's response. "Moreover, a 'strong preference' for resolving cases on the merits is consistently articulated in the Sixth Circuit." *H and M Servs., LLC v. Alliance Inventory Servs., LLC*, No. 2:23-cv-02822, 2025 WL 860371, at *4 (S.D. Ohio Mar. 19, 2025) (citing *Shepard Claims Service v. William Darrah & Associates*, 796 F.2d 190, 193 (1986); *Khamisi v. Neil*, No. 1:20-cv-286, 2021 WL 3634742, at *2 (S.D. Ohio Aug. 17, 2021)) (refusing to strike attorney's response to a motion for summary judgment where there "was no showing of bad faith, the delay was only eleven (11) days, and there is no showing of prejudice" to defendants). Here, plaintiff missed the filing deadline by thirteen days. There has been no showing of plaintiff's bad faith nor of prejudice to Integon. Therefore, the Court will consider plaintiff's response to Integon's motion for summary judgment.

## IV.    Jennings' Breach of Contract Claim Against Integon

Integon contends that the completion of the appraisal process bars plaintiff's breach of contract claim against it as a matter of law, and it moves for summary judgment on that claim. (Doc. 98 at PAGEID 795).  Jennings counters that genuine issues of material fact preclude summary judgment on the breach of contract claim against Integon because Integon failed to timely pay her claim.  (Doc. 104 at PAGEID 877-80).  By delaying payment and then including the estate of her former attorney on the payment, Jennings contends, she has yet to receive the payment so Integon breached its contract with her.  (*Id.*).

In diversity cases, federal courts "apply the substantive law of the forum state."  *SHH Holdings, LLC v. Allied World Specialty Ins. Co.*, 65 F.4th 830, 836 (6th Cir. 2023).  The parties agree that Ohio law applies here.  To establish a breach of contract claim, a plaintiff must show: (1) a valid contract between the parties; (2) defendant failed to perform as required; and (3) damages resulting from that non-performance.  *Nichols v. State Farm Mut. Auto. Ins. Co.*, 634 F. Supp. 3d 426, 431 (S.D. Ohio 2022) (citing *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018)).

As the Sixth Circuit has summarized:

Under Ohio law, insurance policies are contracts, and their terms are interpreted using principles of contract interpretation.  *Sharonville v. Am. Emps. Ins. Co.*, 109 Ohio St.3d 186, 846 N.E.2d 833, 836 (Ohio 2006).  In interpreting a contract, "the principal objective is to determine the intention of the parties" and give effect to that intent.  *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 714 N.E.2d 898, 900 (1999).  The first step in ascertaining the parties' intent is to look at the plain meaning of the words in the contract.  If the language is clear and unambiguous, contract terms are given their plain and ordinary meaning.  *Id.* at 901.

*SHH Holdings, LLC*, 65 F.4th at 837.  "However, if the court determines an insurance policy is ambiguous, 'the policy is construed strictly against the insurer.'"  *Nichols*, 634 F. Supp. 3d at 431 (quoting *Perry v. Allstate Indem. Co.*, 953 F.3d 417, 421 (6th Cir. 2020)).

27

Where a party invokes the appraisal process pursuant to an insurance contract, Ohio courts generally "will not interfere with an appraisal award but, to the contrary, will indulge in every reasonable presumption to sustain it in the absence of fraud, mistake, or misfeasance." *One Church v. Brotherhood Mut. Ins. Co.*, 242 N.E.3d 164, 170 (Ohio App. 2024) (quoting *Lakewood Mfg. Co. v. Home Ins. Co. of New York*, 422 F.2d 796, 798 (6th Cir. 1970)). "To constitute manifest mistake, the mistake must be of such character that the arbitrator or appraiser would have corrected it had it been called to his attention; a mistake of judgment is not manifest mistake." *Id.* at 170-71 (quoting *Lakewood Mfg. Co.*, 422 F.2d at 798).

The relevant facts here are undisputed. The Integon policy covered the damage to Jennings' property caused by the July 27, 2018 storm. Plaintiff promptly notified Integon of the incident. Integon, over Jennings' objection, determined there were two separate losses—one for storm damage to the home's roof and air conditioning unit and another for interior water damage.

Jennings' estimator and the Integon estimators valued the property damage very differently, and in June 2019, Jennings invoked appraisal. The appraisal clause of the Integon policy provides:

> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.
> Each party will:
> 1. Pay its own appraiser; and
> 2. Bear the other expenses of the appraisal and umpire equally.

(Doc. 4-1 at PAGEID 103-04).

On August 28, 2019, Jennings' appraiser and Integon's appraiser met at the property, and the appraisers agreed that Mike Abell would serve as umpire, should the appraisers be unable to agree on the value of Jennings' claim. (Doc. 9-2 at PAGEID 260). The appraisers' "estimates were very different as to the scope of damage and what payments should be made under the policy," so they agreed to submit the matter to the umpire. (*Id.* at PAGEID 260-61).

On May 4, 2020, Jennings filed this action in Brown County, Ohio, and the defendants removed it to this Court. (Doc. 1). On July 13, 2020, Integon successfully moved to stay this action until the appraisal process could be completed. (Docs. 9, 36). Jennings successfully moved for an extension of time to complete the appraisal process because she lacked the funds required to pay the umpire. (Docs. 39, 40). The parties then jointly moved to extend the time to complete the appraisal because "it became clear that appraisal would be a more involved undertaking than initially contemplated." (Doc. 43 at PAGEID 526). On April 16, 2021, the umpire met the appraisers at the property. (Doc. 45). On August 10 and 17, 2021, Integon's appraiser signed the umpire's appraisal, thereby completing the appraisal process under the policy. (Doc. 77-1 at PAGEID 709-10). The umpire established the value of Jennings' roof claim at $12,684.72, and the water damage claim at $23,933.75. (*Id.*).

Beginning September 2, 2021, Integon attempted to pay Jennings the difference between what it had already paid her and the umpire's award. (Doc. 98-1 at PAGEID 803). After delays related to plaintiff's counsel and plaintiff's unwillingness to accept the umpire's award, the Court enforced the appraisal. (Doc. 80). Integon paid plaintiff on February 27, 2023, in accordance with the Court's Order. (Doc. 98-1 at PAGEID 817).

As Integon has paid the amount established under the appraisal process, it contends that it is entitled to summary judgment on plaintiff's breach of contract claim.  (Doc. 98 at PAGEID 790).  The Court agrees.

Payment of the umpire's awards completed the policy's appraisal process, which Jennings admittedly invoked before filing this action.  Jennings has failed to offer evidence of any fraud, mistake, or misfeasance as required to reopen the contractual appraisal process she invoked.  Therefore, Integon is entitled to summary judgment on Jennings' breach of contract claim.

In her response brief, Jennings argues:  (1) Integon was obliged to pay the amount determined by her third-party appraiser ($98,569) within 60 days; and (2) by including the Estate of Gary Lewis on the payment, Integon has effectively failed to pay plaintiff the appraisal award.  (Doc. 104 at PAGEID 878-880).  Plaintiff's contentions are both without merit.

First, as plaintiff accurately quoted, the policy provides, "Loss will be payable 60 days after we receive your proof of loss and: (1) Reach an agreement with you; (2) There is an entry of a final judgment; or (3) There is a filing of an appraisal award with us."  (Doc. 4-1 at PAGEID 104).  However, as used in that section, "filing of an appraisal award" refers to the formal appraisal process employed in this matter which the policy explains shortly above the quoted language, in the section headed "**E.  Appraisal**."  (Doc. 4-1 at PAGEID 103-04).  It does not require payment of plaintiff's appraiser's determination, unless either Integon's appraiser or the umpire agrees with that determination.  (*Id.*)  In this case, there was no agreement reached and no final entry of judgment.  The undisputed evidence demonstrates that Integon's counsel attempted to finalize the payment of the August 2021 umpire's appraisal award beginning on September 2, 2021.  (Doc. 98-1 at PAGEID 803).  However, plaintiff's objection to the appraisal award (Doc.

78 at PAGEID 752) delayed the payment of the amount awarded until the Court Order enforcing the appraisal (Doc. 80).

Second, the policy language plaintiff cited also provides, "[Integon] will pay you unless some other person is named in the policy or is legally entitled to receive payment." (Doc. 4-1 at PAGEID 104). In the Order enforcing the appraisal, the Court specifically ordered:

> Within **14 days** of this order, plaintiffs must inform Integon's counsel **in writing** whether they have reached an agreement with the Estate of Gary Lewis as to the dispersal of the appraisal awards. In the event plaintiffs' fail to timely do so, the Estate of Gary Lewis must be included as a payee on the settlement checks issued by Integon.

(Doc. 80 at PAGEID 760). Because plaintiff failed to either reach an agreement with Lewis's estate or to notify Integon of any agreement, Integon had to include the Estate of Gary Lewis on the check as a person "legally entitled to receive payment" under the terms of the policy (Doc. 4-1 at PAGEID 104). Thus, both arguments raised in plaintiff's response brief lack merit, and Integon is entitled to summary judgment on plaintiff's breach of contract claim.

In addition, plaintiff attached an affidavit to her response brief which purports to list additional breaches of the Integon policy. (Doc. 104-2 at PAGEID 899-903). These statements, even assumed to be true, are similarly insufficient to avoid summary judgment. Plaintiff first alleges that "an Integon claims adjuster never came and physically inspected damages, in person," instead sending a third party contractor to evaluate damages to her property. (Doc. 104-2 at PAGEID 900, ¶¶ 8-9). However, plaintiff fails to identify any language in the 51-page policy that entitles her to a personal inspection by an Integon claims adjuster. (Doc. 104).

Plaintiff next states that she was "forced" to open a second claim for water damage to her home "even though the water damage clearly came from the roof damage, from the hailstorm, which is still damage under one claim," thereby causing her to pay the $1,000 deductible twice

31

(once on each claim) and then mistakenly a second time. (Doc. 104-2 at PAGEID 900, ¶¶ 10-11). Again, plaintiff identifies no contractual entitlement to have the damage treated as a single claim. In addition, counsel's summary of amounts paid on each claim (Doc. 98-1 at PAGEID 803) as previously adopted in the Court's Order enforcing the appraisal awards (Doc. 80 at PAGEID 759) indicates that one $1,000 deductible was applied to each claim. Plaintiff has offered no evidence to refute counsel's computations.[12]

Next, plaintiff contends that "Integon intentionally refused to pay loss of use and rental reimbursement or offer housing assistance I am entitled to, under my policy, even knowing that the severe water and mold damage made the home unsafe to live in," and that leaving the home "sitting vacant for six years" caused additional damages. (Doc. 104-2 at PAGEID 901, ¶¶ 20-27). However, plaintiff testified at her deposition that the home was habitable until the May 3, 2019 storm—after Integon ceased insuring the home and while the home was covered by the Allstate policy—caused a tree to fall on the home. (Doc. 105-1 at PAGEID 1028). The Integon policy also specifically "excludes coverage for mold, fungus or wet rot," although Integon "offers a limited coverage for an additional premium." (Doc. 4-1 at PAGEID 83).

Much of the remainder of Jennings' list of Integon's alleged breaches challenge either the delay in obtaining the appraisal or the final appraisal value. (Doc. 104-2 at PAGEID 900-02, ¶¶ 15-19, 29-35). As stated above, the appraisal process definitively established the value of plaintiff's property damage claim under the Integon policy. (Doc. 80).

---

[12] Jennings stated in her affidavit, "Integon has prepared a check for way less than the agreed amount from the appraisal stating that deductions were made from previous payments. Yet the only payments they made were reimbursement payments, which can't be charged back to us as part of the damages part of the claim." (Doc. 104-2 at PAGEID 902, ¶ 32). However, neither plaintiff nor the attorney representing her at the time of her response to Integon's summary judgment motion identified any specific instances or amounts or offered any evidence in support of her general statement, such as receipts or documentation. In response to Integon's properly supported motion for summary judgment, Jennings must present admissible, probative evidence sufficient to create a genuine issue of material fact. *Maston*, 832 F. Supp. 2d at 851-52 (citing *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010)); *Anderson*, 477 U.S. at 251. She has failed to do so.

As for the delays in completing the appraisal process, the record before the Court establishes that no reasonable jury could find that Integon caused the delay. The following facts are undisputed. Jennings invoked the appraisal clause no later than July 29, 2019. (Doc. 98-2 at PAGEID 821-22). On August 28, 2019, Jennings' appraiser and Integon's appraiser inspected the premises, but they did not agree on the value of the property damage. (Doc. 9-2 at PAGEID 260, Doc. 105-1 at PAGEID 1006). The two appraisers agreed that Mike Abell would serve as umpire if they could not reach an agreement. (Doc. 9-2 at PAGEID 260).

During the property inspection, Integon's appraiser learned that after Integon no longer insured the property, a second storm had caused additional damage. (*Id.*). Cochlin estimated plaintiff's total damages at $96,569.46. (Doc. 19 at PAGEID 313). Integon's appraiser had to base his estimate on "the original adjuster's loss photos" because the home had been so significantly damaged in the second storm. (Doc. 9-2 at PAGEID 260-61). The appraisers' damage estimates "were very different" so they agreed to submit the matter to umpire Mike Abell. (*Id.* at PAGEID 261).

On May 4, 2020, Jennings initiated this action, and on July 13, 2020, Integon moved to compel the appraisal process Jennings had invoked before initiating this action. (Doc. 9). On August 17, 2020, plaintiff moved for an extension of time to respond to Integon's motion to compel appraisal (Doc. 16), which the Court granted (Doc. 17). On September 12, 2020, plaintiff opposed Integon's motion to compel appraisal. (Doc. 19). On February 8, 2021, the Court granted Integon's motion to compel appraisal and ordered the parties to submit the claims to the umpire within 30 days. (Doc. 36). A month later, plaintiff moved to extend the time to submit the competing appraisals to the umpire until April 8, 2021. (Doc. 39). The Court granted plaintiff's motion for an extension (Doc. 40), and then, three weeks later, the parties jointly

33

moved for another extension of time to complete the appraisal (Doc. 43). Again, the Court granted the motion. (Doc. 44). Once the appraisal process was completed on August 17, 2021, Integon's counsel attempted to verify the amounts and pay the appraisal awards to plaintiff, beginning on September 2, 2021. (Doc. 98-1 at PAGEID 803).

Unfortunately, plaintiff's counsel suffered a serious illness, and he passed away on December 6, 2021. (Doc. 53 at PAGEID 547). Plaintiff initiated a separate legal action against her (now deceased) former counsel, thereby necessitating his law firm's withdrawal of representation. (*Id.*). The time required to locate and retain new counsel caused another delay in this case. (Doc. 66). On June 28, 2022, new counsel entered an appearance. (Doc. 70). On August 18, 2022, plaintiff's new counsel filed an amended complaint. (Doc. 74). Integon moved to enforce the appraisal awards (Doc. 77), which the Court granted over plaintiff's objection (Doc. 78). (Doc. 80). Less than two weeks later, Integon's counsel tried to finalize the appraisal payments with plaintiff's new counsel. (Doc. 98-1 at PAGEID 814). Based on these undisputed facts, no reasonable jury could find that Integon breached the insurance contract by unduly delaying the appraisal process. Plaintiff—not Integon—delayed the appraisal process by refusing to cooperate in the appraisal she invoked and then by failing to reach a resolution with her former attorney's estate.[13] Therefore, Integon is entitled to summary judgment on plaintiff's breach of contract claim.

## V. Jennings' Bad Faith Claims Against Integon

Plaintiff alleges that Integon breached its duty of good faith in the timely evaluation and payment of her insurance claim for the July 2018 storm damage. (Doc. 74 at PAGEID 634-36).

---

[13] To the extent that plaintiff alleges that Integon's counsel attempted to "pressure" or otherwise inappropriately influence Lewis during his illness (Doc. 104-2 at PAGEID 902-03), the Court observed counsel's interactions during the pendency of this litigation and reviewed all emails provided and noted nothing unprofessional or inappropriate between the attorneys.

Under Ohio law, "[a]n insurer has the duty to act in good faith in the handling and payment of the claims of its insured." *Dawson v. Allstate Vehicle and Prop. Ins. Co.*, 709 F. Supp. 3d 444, 453 (S.D. Ohio 2024) (quoting *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983)). "An insurer is liable in tort for bad faith whenever 'its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor.'" *Id.* (quoting *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994)). Even where the insurer ultimately pays the claim, "an insurer's 'foot-dragging' in handling and evaluating the claim or an unreasonably low settlement offer may support a bad-faith cause of action." *Crane Serv. & Inspections, LLC v. Cincinnati Specialty Underwriters Ins. Co.*, No. CA2018-01-003, 2018 WL 4293415, *4 (Ohio Ct. App. Sept. 10, 2018)) (quoting *Drouard v. United Servs. Auto. Ass'n*, No. L-06-1275, 2007 WL 707532, *2 (Ohio Ct. App. Mar. 9, 2007)); *Eddy v. Farmers Prop. Cas. Ins. Co.*, 239 N.E.3d 1000, 1006 (Ohio Ct. App. 2024) (same quote); *Cook v. Erie Ins. Co.*, No. 2:18-cv-282, at *4, 2020 WL 13453595 (S.D. Ohio May 5, 2020) (quoting *Unklesbay v. Fenwick*, 855 N.E.2d 516, 521 (Ohio Ct. App. 2006) ("Bad faith claims may also be brought where an insurer delays payment and engages in 'foot-dragging in the claims-handling and evaluation process' that is not reasonably justified.").

In evaluating a motion for summary judgment, "[t]he key inquiry is whether the insurance company's reasoning for its decision to deny or delay benefits was reasonably justified." *Cook*, 2020 WL 13453595, at *4. To defeat an insurer's summary judgment motion, an insured must submit evidence that, when viewed in the light most favorable to the insured, creates a genuine issue of fact that the insurer's handling of the claim was not done in good faith, i.e., not predicated upon circumstances that provide reasonable justification. *Crawford v. American Family Ins. Co.*, ___ N.E.3d ___, 2024 WL 4717936, at *12 (Ohio Ct. App. 2024).

As detailed above, the undisputed evidence demonstrates that Jennings caused most of the delay in the appraisal process. Therefore, any delay from the date Jennings invoked appraisal through payment of the appraisal award cannot form the basis of a bad faith claim against Integon.

The issue, then, is whether plaintiff has offered sufficient evidence to create a genuine issue of fact that Integon acted in bad faith from the date Jennings initiated the claim to the date she invoked appraisal. Although plaintiff (at that time represented by counsel) provided two pages of factual allegations in support of her bad faith claim (only one paragraph of which occurred before she invoked appraisal), she failed to cite to any evidence to support her allegations. (Doc. 104 at PAGEID 882-83).

In response to a motion for summary judgment, a plaintiff must set forth specific facts demonstrating a genuine issue for trial. *Anderson*, 477 U.S. at 248; *First Nat'l Bank of Arizona*, 391 U.S. at 288; *Lacey v. Dep't of Veterans Affs.*, No. 24-5146, 2025 WL 573890, at *4 (6th Cir. Jan. 2, 2025). The party asserting a fact "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). In evaluating the motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Despite plaintiff's lack of citation, the Court was able to discern the following timeline from existing evidence in the record. The parties agree that the Integon policy covers the July 27, 2018 storm damage to plaintiff's home. Jennings promptly reported the damage to Integon, and, over her objection, Integon separated her claim into two separate claims, one for roof/air conditioner damage and a second for interior water damage. (Tonelli Aff., Doc. 98-2 at PAGEID 819; Jennings Aff., Doc. 104-2 at PAGEID 900).

Integon engaged Hausch & Company, who provided "an initial roof estimate" within approximately two weeks of the storm.  (Tonelli Aff., Doc. 98-2 at PAGEID 819).[14]  Hausch initially estimated plaintiff's interior water damage claim at $1622.12.  (Doc. 98-2 at PAGEID 820).  Concluding Integon was "intentionally low-ball[ing]" her, plaintiff objected to the Hausch estimates.  (Doc. 104-2 at PAGEID 900).

On September 27, 2018, Hausch wrote an "updated roof estimate" of $7,220.10.  (Doc. 98-2 at PAGEID 819).  Integon paid Jennings $3,345 ($7,220.10 updated replacement value minus $2,875.10 for depreciation minus $1,000 deductible) for her roof that same day.  (*Id.*).

In addition, Hausch conducted a "subsequent reinspection" on plaintiff's interior water damage and provided an updated estimate of $10,908.79 for plaintiff's interior water damage claim.  (Doc. 98-2 at PAGEID 820).  On November 5, 2018, Integon paid Jennings $6,426.04 ($10,908.79 updated replacement value minus $2,860.63 for depreciation minus $1,000 deductible minus $622.12 previously paid to plaintiff).  (*Id.*).

On December 17, 2018, plaintiff indicated roof repairs had been completed, and Integon paid Jennings the $2,875.10 for depreciation within 10 days.  (*Id.* at PAGEID 819-20).  Thus, as of December 27, 2018, Integon had paid Jennings a total of $10,510.10 for her roof and air conditioning claim ($7,220.10 updated Hausch estimate minus $1,000 deductible plus $4,290 for the air conditioner) and $8,248.16  for her interior water damage claim ($10,908.79 updated Hausch estimate minus $2,860.63 for depreciation and $1,000 deductible plus $750 and $450 previously paid "for emergency repairs").  (Doc. 98-2 at PAGEID 820, Doc. 9-1 at PAGEID 205).

---

[14] On August 20, 2018, Integon "made a separate payment to [Jennings] in the amount of $4,290" for damage to the air conditioning system.  (Doc. 98-2 at PAGEID 819).  Neither party raised issues related to the air conditioning system in their briefing.

Jennings and Integon had no further communication until June 25, 2019, when Jennings

informed Integon she intended to invoke appraisal under the Integon policy. (Doc. 98-2 at

PAGEID 820, Doc. 104-2 at PAGEID 900). Integon's Claims Manager swore that "[a]ll of our

payments to [Jennings] were complete as of December 2018." (Doc. 9-1 at PAGEID 205).

According to Jennings, "Integon went without communicating with me from Dec 2018 to June

2019, which is a bad faith attempt to 'walk away' from the claim and not address the payment

and settlement issues, intentionally delaying the claim for 6 more months." (Doc. 104-2 at

PAGEID 900). Jennings does not identify any efforts she made to communicate with Integon

during that period.

During this non-communicative period—and specifically on May 3, 2019—high winds

caused a tree to fall on Jennings' home. (Doc. 130-4 at PAGEID 1548). By that time, Integon's

policy had terminated, and Allstate insured the home. (Doc. 114-3 at PAGEID 1153). Jennings

testified at her deposition that the May 2019 tree damage caused the home to become

uninhabitable. (Doc. 105-1 at PAGEID 1028).

Ultimately, the umpire's appraisal decisions required Integon to pay Jennings an

additional $5,454.62 on her roof claim and an additional $14,685.59 on her water damage claim.

(Doc. 77-1 at PAGEID 709-11). The Court notes the fairly dramatic difference between

Integon's initial $1,622.12 estimate on plaintiff's interior water damage claim (Doc. 98-2 at

PAGEID 820), its updated valuation of $10,908.79 (*Id.*)., and the umpire's $23,933.75 valuation

(Doc. 77-1 at PAGEID 710).[15] Similarly, Hausch's September 13, 2018 estimate valued

plaintiff's roof damage at $7,220.10 (Doc. 19 at PAGEID 305-307), and the umpire valued it at

---

[15] The Court notes that Hausch completed its estimates in summer and fall of 2018 while the umpire's valuation—due to plaintiff's efforts to withdraw from the appraisal process she had invoked—was not finalized until August 2021. Neither party offers evidence of whether the umpire's valuation controlled for inflation.

$12,684.72 (Doc. 77-1 at PAGEID 709). Don Cochlin, on July 10, 2019 (after the second storm caused the tree to fall on the home), estimated the work to repair the "[w]hole house" due "to wind and rain damages" at $96,569.47. (Doc. 19 at PAGEID 311-13). Plaintiff's most recent estimate, dated September 10, 2021, recommends that the house be torn down and rebuilt at a cost of $329,272. (Doc. 105-1 at PAGEID 1025).

To establish a claim for breach of an insurer's duty to act in good faith, an insured must offer evidence that the insurer's actions are "not predicated upon circumstances that furnish reasonable justification therefor." *Crawford*, 2024 WL 4717936, at *4 (quoting *Zoppo*, 71 Ohio St. 3d at syl. para. 1). To grant an insurer's motion for summary judgment on the issue of whether it lacked good faith, a court must find—viewing the evidence in the light most favorable to the insured—that the reasonable justification standard has not been met. *Butler v. Auto-Owners Ins. Co.*, No. 1:23-cv-529, 2024 WL 5137556, at *4 (S.D. Ohio Dec. 17, 2024) (applying a "fairly debatable" test to determine if insurer's decision was reasonably justified). "A dispute as to **the value of the claim** does not in and of itself constitute bad faith." *Id.* at n.11 (quoting *Baker v. State Farm Ins. Co.*, No. 99-COA-1314, 2000 WL 699646, at *1 (Ohio Ct. App. Apr. 27, 2000)).

Viewing the evidence in the light most favorable to Jennings, Integon is entitled to summary judgment on her bad faith claim. It is undisputed that Integon based its claim valuation on estimates from professional, licensed contractors. When Jennings was displeased with the estimates, she appropriately invoked the appraisal process under the terms of her insurance policy. Ultimately, the umpire made his own valuation, and Integon paid the umpire's award as promptly as possible. Neither Integon nor this Court has any role in Jennings' ongoing dispute with her former attorney's estate so any delays receiving payment from the estate cannot serve as

the basis for a bad faith claim in this matter. Accordingly, Integon's motion for summary judgment on plaintiff's bad faith claims will be granted.

**VI.     Jennings' Breach of Contract Claim Against Allstate**

On May 3, 2019, high winds caused a tree to fall on plaintiff's already storm-damaged property. Allstate acknowledges that its policy covered the May 3, 2019 storm damage. (Doc. 114-3 at PAGEID 1153). Allstate promptly assigned the structure portion of plaintiff's claim to adjuster Bob Roth and the additional living expenses portion to adjuster Alison Davis. (*Id.*).

On September 30, 2021, plaintiff, with the advice of counsel, signed a partial release and indemnity agreement under which Allstate paid plaintiff $71,446, and plaintiff released all claims "arising out of the property damage, expenses, and any loss or damage resulting from the occurrence of May 3, 2019 . . . ." (Doc. 130-2 at PAGEID 1469). The agreement additionally linked the partial release to the Belfor estimate for damage to the structure. (*Id.* at PAGEID 1469-70).

On the same day, September 30, 2021, Jennings and Allstate, through counsel, filed a notice of partial dismissal with prejudice. The notice stated in its entirety:

> Notice is hereby given that pursuant to Rule 41(a)(1)(A)(ii), all matters in controversy at issued with Plaintiffs and Defendant, Allstate Vehicle and Property Insurance Company, for property damage pertaining to Plaintiffs' breach of contract claims are hereby dismissed with prejudice for all purposes. The remaining claims of the Plaintiffs against Allstate Vehicle and Property Insurance Company are not dismissed hereby.

(Doc. 46 at PAGEID 532).

Allstate contends that the $71,446 payment settled Jennings' property damage claim against it, and plaintiff's May 3, 2019 property damage breach of contract claim against Allstate was voluntarily dismissed on September 30, 2021. (Doc. 114 at PAGEID 1106-08). The Court agrees.

As explained above, the Court must ascertain the parties' intent by examining the plain meaning of the contractual language, and, if the language is clear and unambiguous, give the contract terms their plain and ordinary meaning.  *See SHH Holdings, LLC*, 65 F.4th at 837. Pursuant to the clear and unambiguous language of the contract, plaintiff agreed, in exchange for more than $71,000, to hold Allstate "forever harmless" "from any and all further claims" for the May 3, 2019 property damage described in the Belfor estimate and to dismiss with prejudice those claims.  (Doc. 130-2 at PAGEID 1469-70).  The same day Jennings signed the settlement agreement, the parties jointly dismissed with prejudice her breach of contract claim for that property damage.  (Doc. 46 at PAGEID 532).

Plaintiff contends the following in response to Allstate's motion for summary judgment on her breach of contract claim:  (1) Allstate failed to pay the amounts estimated by appraisers plaintiff hired, including Don Cochlin and Rubenstein Construction, so "Allstate failed to meet its obligation under the Policy by not promptly reimbursing [Jennings] for the incurred loss upon demand" (Doc. 130 at PAGEID 1461); (2) Allstate offered Jennings the $71,446 amount "two years prior and included additional supplements for damages that are 'unseen' or behind walls and drywall" but then, after delaying matters until Jennings faced financial hardship, "would then only release the initial offered amount if [plaintiff] signed a release for the structural portion of the claim" and included Gary Lewis on the payment even though the insurance contract was between Allstate and Jennings (Doc. 130 at PAGEID 1462-63); and (3) Jennings has "not received all reimbursement for the Additional Living Expenses and Personal Property portion of the Policy and have only resolved the structural claim within the scope of the Belfor estimate" (Doc. 130 at PAGEID 1463).  The Court will address each contention in turn.

### a. Failure to Pay Appraiser Estimated Amount

As to plaintiff's first contention, plaintiff identifies no policy language entitling her to payment "upon demand" in the amount estimated by her chosen appraiser. (Doc. 130 at PAGEID 1461). To the contrary, her Allstate policy provides:

> **We** will settle any covered loss with **you** unless some other person or entity is named in the policy. **We** will settle within 60 days after the amount of loss is finally determined. This amount may be determined by an agreement between **you** and **us**, an appraisal award or a court judgment.

(Doc. 130-3 at PAGEID 1522). In this case, the amount of loss was not finally determined as to the structural damage to the dwelling until the parties reached agreement on the $71,446 figure in September 2021. (Doc. 130-2 at PAGEID 1469-70). Allstate issued payment in that amount by check on September 16, 2021, which was deposited into the account of plaintiff's counsel at that time, Gary Lewis. (Doc. 114-3 at PAGEID 1166). Plaintiff offers no evidence that the amount of any other loss caused by the May 3, 2019 storm has been finally determined.

Plaintiff references "appraisals" by Don Cochlin totaling $96,569[16] and by Rubenstein Construction totaling $293,118.57 (for a rebuild of the home). (Doc. 130 at PAGEID 1461, Doc. 130-3 at PAGEID 1538-39). However, plaintiff sought these estimates from private contractors. (Doc. 130 at PAGEID 1461). These estimates are not an "appraisal award" as that term is used in the Allstate policy.

The policy specifically describes the process to obtain an appraisal award as follows:

**Appraisal**

If **you** and **we** fail to agree on the amount of loss, either party may make written demand for an appraisal. Upon such demand, each party must select a competent and impartial appraiser and notify the other of the appraiser's identity within 20 days after the demand is received. The appraisers will select a competent and impartial umpire. If the appraisers are unable to agree upon an umpire within 15

---

[16] Although plaintiff references Don Cochlin's estimate, it was not included in the exhibits attached to her affidavit. (Doc. 130-1).

days, **you** or **we** can ask a judge of a court of record in the state where the **residence premises** is located to select an umpire.

The appraisers shall then determine the amount of loss, stating separately the actual cash value and the amount of loss to each item.  If the appraisers submit a written report of an agreement to **you** and to **us**, the amount agreed upon shall be the amount of loss.  If they cannot agree, they will submit their differences to the umpire.  A written award agreed upon by any two will determine the amount of loss.

Each party will pay the appraiser it chooses, and equally bear expenses for the umpire and all other appraisal expenses.

(Doc. 130-3 at PAGEID 1522).  Plaintiff invoked appraisal under the Integon policy, but there is no allegation or evidence that she invoked appraisal under the Allstate policy.  In addition, plaintiff cited Don Cochlin's estimate of $96,569 as her appraisal for damage from the July 27, 2018 storm covered by the Integon policy.  (Doc. 104 at PAGEID 873).  Plaintiff has identified no evidence that the May 3, 2019 storm covered by the Allstate policy caused identical damage to plaintiff's home as the July 27, 2018 storm covered by Integon.

### b.  Delay and Refusal to Pay $71,446 Until Plaintiff Signed a Release

Plaintiff next contends that Allstate offered her $71,446 "two years prior and included additional supplements for damages that are 'unseen' or behind walls and drywall" but then, after delays put Jennings into financial hardship, "would then only release the initial offered amount if she signed a release for the structural portion of the claim."  (Doc. 130 at PAGEID 1462).  The undisputed evidence submitted does not provide factual support for plaintiff's contention.

According to the emails plaintiff submitted, on October 22, 2019, Bob Roth agreed to provide plaintiff with a copy of the Belfor estimate [which provides the basis for the $71,446 figure] as soon as Allstate approved it.  (Doc. 130-2 at PAGEID 1486).  Roth simultaneously requested a copy of Jennings' contractor's estimate.  (*Id.*).  Following additional emails between

43

Roth and Jennings during which it became apparent that they were unable to agree on the amount Jennings and her husband would be paid for work they performed on the home and the requirements for the proof of loss form (Doc. 130-2 at PAGEID 1487-92), Jennings requested a telephone number for Roth's supervisor, which he provided.  (*Id.* at PAGEID 1491-92).

On November 6, 2019, Allstate assigned the matter for special investigation by Dawn Syler.  (Syler Aff., Doc. 136-2 at PAGEID 1654).[17]  On November 14, 2019, Jennings emailed Roth that she found the Belfor estimate fair as long as Allstate understood that the number might increase if the repairs revealed additional damage.  (Doc. 130-2 at PAGEID 1473).  Rather than agreeing with Jennings, Roth responded that Syler needed to complete the investigation before any more payments would be made.  (*Id.*).  Throughout November and December, Syler tried unsuccessfully to complete her investigation.  (Doc. 136-2 at PAGEID 1654-56).

On January 6, 2020, Syler received a letter of representation from Gary Lewis.  (*Id.* at PAGEID 1656).  Once Syler received the umpire's award on the Integon claim and determined any overlaps between the two claims in August 2021, Allstate promptly settled plaintiff's claim for structural damage.  (*Id.* at PAGEID 1658).  Having received Lewis's letter of representation, Allstate properly issued the check to Jennings and Lewis.  The dispute between Jennings and her former counsel remains pending in the Court of Common Pleas for Hamilton County Ohio, and this Court has no jurisdiction over that action.  *Jennings v. Estate of Gary R. Lewis*, No. A 2204408 (filed Dec. 2, 2022).

### c.  Additional Living Expenses and Personal Property

Plaintiff next contends that Allstate is not entitled to summary judgment on her breach of contract claim because questions of fact exist as to whether Allstate unreasonably delayed the

---

[17] Jennings does not dispute Syler's affidavit or offer evidence contrary to that contained in Syler's affidavit.

claims process since plaintiff still has not received "all reimbursement" for her additional living expenses and personal property losses. (Doc. 130 at PAGEID 1463). However, Allstate's policy with Jennings covers additional living expenses for "[u]p to 24 months not to exceed $80,800." (Doc. 114-4 at PAGEID 1188). Allstate offered evidence that it "completely exhausted" plaintiff's coverage limit for additional living expenses. (Doc. 114-3 at PAGEID 1165, ¶ 33).

Jennings does not dispute that Allstate exhausted her policy limit for additional living expenses. (*See* Doc. 130). Rather, plaintiff contends that she is entitled to additional damages for living expenses because Allstate unreasonably delayed the claims process. (Doc. 130 at PAGEID 1462-63). Any additional damage requests due to unreasonable delay in the claims process are more properly analyzed as part of plaintiff's bad faith claims against Allstate. Therefore, Allstate fulfilled its contractual duty to pay plaintiff's additional living expenses. Accordingly, Allstate's motion for summary judgment on plaintiff's breach of contract claim will be granted.

## VII. Jennings' Bad Faith Claims Against Allstate

Plaintiff alleges that Allstate breached it duty of good faith in the timely evaluation and payment of her insurance claim for the May 3, 2019 damage to her home. (Doc. 74 at PAGEID 637-640). Allstate has moved for summary judgment on plaintiff's bad faith claims. (Doc. 114 at PAGEID 1109-1110).

As discussed above, Ohio law imposes liability in tort for bad faith whenever an insurer unreasonably delays or refuses to pay a claim without reasonable justification for doing so. *Dawson*, 709 F. Supp. 3d at 453. To defeat an insurer's summary judgment motion, an insured must submit evidence that, when viewed in the light most favorable to the insured, creates a

genuine issue of fact that the insurer's handling of the claim was not predicated upon circumstances that provide reasonable justification. *Crawford*, 2024 WL 4717936, at *12.

Jennings' home suffered damage from a fallen tree on May 3, 2019. Within four days of the May 3, 2019 tree damage, Allstate had secured plaintiff's home and contracted with Hays and Sons to inspect the property and provide a repair estimate. (Doc. 114-3 at PAGEID 1153). Allstate adjuster Alison Davis also sent Jennings a letter on May 7, 2019, explaining how to track and submit her additional living expenses and contact information for both adjusters assigned to her claim. (*Id.* at PAGEID 1168-70). Within 10 days, Donan Engineering had performed its initial inspection of Jennings' home, but required approval to remove part of the ceiling for proper evaluation. (*Id.* at PAGEID 1154-55).

Jennings then slowed the process by rejecting Hays and Sons' involvement and requesting that her own electrician and public adjuster ("PA") inspect her home instead. (*Id.* at PAGEID 1155). The last week of May 2019, Jennings went on vacation. (*Id.* at PAGEID 1156). The first week of June 2019, Jennings informed Roth that her PA was on vacation, and Roth indicated that "things need to get moving to prevent further damage" since it already had been a month since the tree damaged the property. (*Id.* at PAGEID 1156-57).

By June 17, 2019, Roth was still waiting to hear from Jennings' PA. (*Id.* at PAGEID 1157-58). Meanwhile, Davis mailed Jennings a letter explaining the need for a completed proof of loss form and urging Jennings to promptly submit the form. (Doc. 114-3 at PAGEID 1171). The letter included a blank form and reiterated the policy holder's responsibilities after a loss. (*Id.* at PAGEID 1171-75).

In mid to late June, 2019, Roth reiterated Allstate's need to inspect and evaluate the damage and again asking Jennings to have her PA contact him. (*Id.* at PAGEID 1158). On June

24, 2019, Roth called Jennings and left a message indicating he had not heard from Cochlin and that her claim was on hold until Cochlin contacted him.  (*Id.* at PAGEID 1158-59).  Roth again noted that "additional damages may not be covered due to delays."  (*Id.* at PAGEID 1159).  The next day, Jennings informed Roth that Cochlin had assessed the damages and would send the information to Allstate, but Cochlin was acting only as her appraiser so Roth should continue to work directly with her on the claim.  (*Id.*).  Having learned that the Donan engineer Roth previously engaged was no longer with the company, Roth contacted Rimkus Engineering to set up an inspection for the following Tuesday.  (*Id.*).

On July 3, 2019, the Rimkus engineer advised Roth that he had met with Jennings at the property, and he would prepare his report for Allstate.  (*Id.*).  Two days later, Roth contacted Jennings to initiate arrangements for the rental of a mobile home while her home was uninhabitable.  Roth informed Jennings that he could not set up an estimate for the repairs until he received the engineer's report.  (*Id.* at PAGEID 1160).

On July 25, 2019, Roth received the engineer's report, assigned Belfor Property Restoration to perform Allstate's repairs estimate, and informed Jennings that he had done so. (*Id.*).  Jennings emailed a bill for the work her husband had completed for temporary repairs. (*Id.*).

Belfor scheduled the inspection for August 5, 2019, but, due to a death in the family, Jennings needed to reschedule.  (*Id.* at PAGEID 1161).  On August 12, 2019, Roth received an email from "Don" asking if Allstate had assigned an appraiser, but Roth responded that Jennings had not invoked "appraisal" as that term is used in the insurance policy.  (*Id.*).  When Roth "received a copy of an appraisal contract" between Jennings and Cochlin, he emailed Cochlin

and Jennings "regarding the fact that no request for an appraisal had been made" and attached the policy language regarding appraisal. (Doc. 114-3 at PAGEID 1161).

On August 14, 2019, Davis mailed Jennings a letter reminding her that Allstate still needed "the completed, signed, and notarized Proof of Loss form that was mailed to you on June 17, 2019." (Doc. 114-3 at PAGEID 1176). The letter included a second blank form as well as a request for "any bills, receipts, and inventories pertinent to this loss." (*Id.*). Davis further advised Jennings that she "cannot complete the investigation of the loss without these documents." (*Id.*).

On August 19, 2019, Roth again asked Jennings to schedule the Belfor inspection. (*Id.* at PAGEID 1162). On September 16, 2019, a Belfor representative advised Roth that Jennings had called Belfor to say that she had been ill but was now ready to schedule the inspection. (*Id.*).

On September 19, 2019, Davis sent Jennings a letter stating, in part, that she still needed Jennings' proof of loss form and intended to discontinue consideration of Jennings' claim if Jennings did not schedule the Belfor inspection by October 1, 2019. (Doc. 114-3 at PAGEID 1177).

Belfor completed the inspection on October 1, 2019, and began preparing its estimate. (Doc. 114-3 at PAGEID 1163). On October 9, 2019, Jennings finally submitted a notarized proof of loss form, but she wrote "unknown" for the amount of her claim and attached no bills or receipts in support of her claimed losses. (*Id.* at PAGEID 1163, 1178-79; Doc. 130-4 at PAGEID 1548-49). The following day, Davis sent Jennings a third blank proof of loss form and rejected the form Jennings provided because it contained no breakdown of figures or detailed statement of her claimed losses to date. (Doc. 114-3 at PAGEID 1180).

On October 21, 2019, Jennings emailed Roth a request for the Belfor estimate, indicating that "Matt said it was submitted to you a while ago." (Doc. 130-2 at PAGEID 1486). Early the next morning, Roth responded that he had received Belfor's "initial estimate draft and it is still under review/revision," but he would send a copy once it was approved. (Doc. 130-2 at PAGEID 1486, Doc. 114-3 at PAGEID 1163 ("revisions were requested")). Roth also asked Jennings for a copy of her contractor's estimate. (Doc. 130-2 at PAGEID 1486).

Also on October 22, 2019, Jennings again requested payment for her moving expenses and the work she and her husband performed in tarping and temporary repairs to the home. (Doc. 130-2 at PAGEID 1487). She repeated her demand to "be paid at contractor pay," noting that she and her husband "are a licensed business/general contractor." (*Id.*). Roth responded within hours that Allstate disputed the amount claimed because, as previously explained to her, Jennings had not settled the issues regarding the "price factors" that "aren't applicable to work done by an individual." (*Id.* at PAGEID 1487-88). He also requested photographs or timesheets for work performed and paid receipts for claimed expenses. (*Id.* at PAGEID 1487). Jennings immediately replied that Allstate told her to cut out the ceilings so the engineer could fully evaluate the damage, that a contractor sends invoices rather than paid receipts for work performed, and that she needed "numbers from your company or a full assessment of costs and damages to personal property" to complete the proof of loss form. (Doc. 130-2 at PAGEID 1489).

On October 23, 2019, Roth emailed Jennings that he would be "happy to reimburse you for expenses you've incurred," once she provides "receipts or verification for those expenses" as well as the information sought in his August email. (*Id.* at PAGEID 1491). Jennings immediately requested the name and telephone number for Roth's supervisor. (*Id.*).

On October 24, 2019, Jennings explained the difference in hourly rates that she and her husband charged as "due to emergency services."  (Doc. 130-2 at PAGEID 1492).  She further noted that the engineers Allstate hired had verified and taken pictures of the damaged areas as well as "the cut out ceilings and removal of insulation and containment" that the Jennings had completed.  (*Id.*).  In addition, Jennings and her family packed and removed their possessions "long before you stipulated the storage had to be onsite."  (*Id.*).  She agreed to forward to Roth "additional rent receipts" and expenses related to moving her minor son "whose room was the most affected by the tree and moisture/mold" (*Id.*), but there are no such receipts in the record.

That same day, Roth agreed to pay Jennings $1492.29 "for lines 1-4" of the document she submitted earlier as well $34.62 per hour for two people for 12 hours each (for a total of $830.88) for packing and item removal.  (*Id.*).  According to Roth, any additional payments for work performed by Jennings and her family or related moving or living expenses would require the requested verification.  (*Id.*).  Roth also provided his supervisor's name and telephone number.  (*Id.*).

In November 2019, Jennings filed a complaint with the Ohio Department of Insurance (Doc. 130-1 at PAGEID 1468; Doc. 130-3 at PAGEID 1494), and Allstate assigned special investigator Syler to Jennings' claim.  (Doc. 136-2 at PAGEID 1654).  In addition, Roth emailed Jennings a copy of the approved Belfor estimate.  (Doc. 130-2 at PAGEID 1472).  Roth's email indicated that part of the estimate included "work needed as a result of delays and the lack of timely mitigation and will need to be discussed further."  (*Id.*).  Later that month, Jennings advised Roth that the Belfor estimate is "fair; with the understanding that there may be additional supplements added as they dig deeper and may find more damage once the job gets started"

(Doc. 130-2 at PAGEID 1473), but Roth replied that no additional payments would be made until Allstate completed its investigation. (*Id.*).

From November 18, 2019 through early 2020, Jennings sought payment on various parts of her claim while Roth and Syler sought the completed proof of loss form, additional information about Jennings' handwritten receipts, and an examination of Jennings under oath. (Doc. 130-2 at PAGEID 1473-1477, Doc. 136-2 at PAGEID 1165-1166). On May 5, 2020, Jennings filed the instant action in the Court of Common Pleas in Brown County, Ohio. (Doc. 1-4).

Viewing this undisputed evidence in the light most favorable to Jennings, no reasonable juror would conclude that Allstate delayed the evaluation and claims process without reasonable justification. Allstate urged Jennings frequently to allow inspections, provide required documentation, and submit to an examination by their investigators. Jennings obviously found these requests burdensome, frustrating, and sometimes confusing. (*See* Doc. 130-2 at PAGEID 1472-77). However, it was a burden Jennings contractually agreed to undertake. (Doc. 130-2 at PAGEID 1475). The fact that the property suffered damages from three overlapping but separate causes while covered by two different insurance companies and then uninsured undoubtedly exacerbated the difficulties in documenting and evaluating Jennings' claims. Regardless, the undisputed evidence demonstrates that Allstate complied with its contractual obligations under the policy and any delays were either reasonably justified or caused by Jennings. Accordingly, Allstate's motion for summary judgment on plaintiff's bad faith claims will be granted.

## IT IS THEREFORE ORDERED THAT:

1. The stay previously imposed in this matter is hereby lifted.

2. Integon's motion for summary judgment (Docs. 98, 100) is **GRANTED**.

3.  Allstate's motion for summary judgment (Docs. 114, 117) is **GRANTED**.

Date: 5/30/2025

Karen L. Litkovitz
United States Magistrate Judge